UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:07-00256 |
| | ) | JUDGE ECHOLS |
| JAMES ALEXANDER and JEFFREY | ) | |
| ODOM, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM

Pending before the Court are the Motions to Suppress (Docket
Entry Nos. 23 & 28) filed by Defendants James Alexander and Jeffrey
Odom.  The Government filed Responses to both motions.  (Docket
Entry Nos. 25 & 37.)  The Court held an evidentiary hearing on
June 20, 2008.

I.  FINDINGS OF FACT

On March 21, 2007, uniformed Murfreesboro Police Officer
Jacoby O'Gwynn was patrolling alone in his marked squad car in the
area of University, Vine, Sevier and Hancock Streets.  His shift
that day was 2:00 p.m. to 10:00 p.m. and, as a member of the crime
suppression unit, he was assigned to patrol a six-block area in a
high crime area of Murfreesboro.  During his eight-hour shift he
passed by the same areas again and again, and he passed a
particular house approximately ten (10) times.  He noticed that a
barbecue was taking place at the home and at least half the times
he passed by the house he observed two men, later identified as
Defendants Alexander and Odom, sitting in the front yard eating and

1

drinking.  At the time of his observations, Officer O'Gwynn did not
know the men's identities, but he had previously seen Odom in the
neighborhood numerous times.  He did not see the men do anything
illegal as they socialized in the front yard where the barbecue was
taking place.

Later on the evening of March 21, 2007 at approximately 9:28
p.m., when it was dark outside, Officer O'Gwynn had just completed
a traffic stop when he noticed a four-door blue Chevy Lumina
driving on University Street towards Vine Street.  The car was not
speeding; however, the vehicle did not have a white light or lamp
illuminating the rear license plate.

Officer O'Gwynn is aware that the City of Murfreesboro adopted
an ordinance, § 32-1005(c), requiring automobile license plates to
be illuminated by a white light to a distance of fifty (50) feet.[1]
Officer O'Gwynn has read the ordinance and he has received training
on it.  He is sworn to enforce the Murfreesboro Code as well as
state law.  He has made hundreds and perhaps a thousand vehicle
stops based on violation of the license plate ordinance, and he
enforces the ordinance because he believes it is a lawful
ordinance.  He does not issue many citations to drivers for not
having a proper rear license plate light because "not everyone
deserves a ticket."  He admitted, however, that giving citations

_____

[1]The Court sustained Defendant Alexander's objection to
admission of a copy of the Murfreesboro ordinance into evidence on
the ground that the Government failed to lay sufficient foundation
for the exhibit.  (Gov't Ex. 1, marked for identification only.)

for this ordinance violation would help ensure correction of the violations and that, without record of citations being given, it is less likely that corrections are made. The traffic stop Officer O'Gwynn completed just before the one at issue here was also for a violation of the license plate ordinance.

Officer O'Gwynn followed the Chevy Lumina and watched it stop at the stop sign on the corner of Vine and Hancock. The Lumina was less than fifty (50) feet from Officer O'Gwynn's patrol car. As the car turned right onto Hancock Street, Officer O'Gwynn turned on the patrol car's blue lights to stop the Lumina for the ordinance violation. Officer O'Gwynn did not know how many individuals were riding in the car, he did not know the identity of the driver or any passengers, and he had no basis to believe that anyone riding in the vehicle had been involved in criminal activity or that criminal activity was about to occur. He decided to stop the car solely because of the license plate ordinance violation.

As Officer O'Gwynn turned on the patrol car's blue lights, a video recorder on the dashboard of the patrol car began recording the vehicle stop automatically. (Gov't Ex. 2.) The date and time stamped on the video are inaccurate in that the date should be March 21, 2007 instead of March 20, 2007, and the beginning time should be 21:28 (9:28 p.m.) rather than 20:28 (8:28 p.m.). In all other respects the video accurately depicts the vehicle stop.

Still photographs produced from the police video of the vehicle stop appear to show that the Lumina's rear license plate was illuminated as Officer O'Gwynn followed the Lumina from the

3

stop sign on Vine around the street corner onto Hancock. The Court cannot tell from these photographs, however, whether the Lumina's license plate was illuminated by a white light above the tag or whether the license plate was illuminated when light from the headlights or blue lights of Officer O'Gwynn's patrol car struck the reflective coating on the license plate. The Court accepts Officer O'Gwynn's testimony that the license plate was not illuminated by a separate operating white light affixed above the license plate, as required by the Murfreesboro ordinance. (Def. Exs. 2, 2A, 2B.)

As the Lumina rolled to a stop near Hancock and Sevier Streets, Officer O'Gwynn radioed to the dispatcher the Lumina's license plate number only to inform the dispatcher that he was making a stop of that particular vehicle. Officer O'Gwynn did not ask the dispatcher to run the license plate information at that time to check ownership and registration of the vehicle and the dispatcher did not run a license tag check automatically.

Officer O'Gwynn approached the driver's side of the vehicle. He told the driver, who identified herself as Latrice Johnson, that he stopped her because the car's rear license plate was not illuminated as required by the ordinance. He did not ask her to get out of the car so he could show her that the license plate was not properly illuminated. Officer O'Gwynn asked Ms. Johnson to produce her driver's license, vehicle registration, and proof of insurance. Ms. Johnson had these documents attached together on her sun visor and promptly handed them out the window. Officer

4

O'Gwynn asked Ms. Johnson if she had any guns, knives, drugs or other contraband. She answered, No." According to Officer O'Gwynn, Ms. Johnson was not free to leave.

Officer O'Gwynn noticed three passengers in the car. A man, later identified as Ms. Johnson's boyfriend, Jeffrey Odom, sat in the front passenger seat. A woman, Millie Gaines, sat in the left rear passenger seat and a man, James Alexander, sat in the right rear passenger seat. Ms. Gaines is a half-sister to Ms. Johnson, and Ms. Johnson knew Alexander through Odom. Officer O'Gwynn recognized the two men as the ones he had seen attending the front yard barbecue.

Officer O'Gwynn asked the passengers to produce their identification. He did this because he wanted to gauge their reactions, and he follows the same procedure no matter who he stops. Odom handed Officer O'Gwynn a state probation card which contained his identifying information and photograph. The rear seat passengers indicated they did not have any identification. Officer O'Gwynn then asked for their names, dates of birth, and Social Security numbers. He requests such information as standard procedure to check for any outstanding arrest warrants. Ms. Gaines identified herself as Terry Harris and gave a date of birth and Social Security number. Alexander identified himself as Deran Albert and also gave a date of birth and Social Security number. Officer O'Gwynn told the car's occupants to "just hang tight and I'll be back with you in a minute."

5

As Officer O'Gwynn turned to go back to his patrol car to run computer checks on the information he had been given, he noticed Officer Harry Haigh, also uniformed and armed, had arrived to provide backup. Officer Haigh's patrol car was parked behind Officer O'Gwynn's, and Officer Haigh was standing at the rear of the Lumina's passenger side to counteract anything that might happen. According to Officer Haigh, the passengers were not free to leave because if Odom had stepped out to leave, Officer Haigh would have made him stay at the scene.

Officer O'Gwynn got back into his patrol car to use a laptop computer. Ms. Johnson's driver's license, registration and proof of insurance were valid. Officer O'Gwynn called the Sheriff's Department to see if there were any active warrants on the driver or the three passengers and apparently there were none. The Social Security number Ms. Gaines provided matched the name Terry Harris. The Social Security number Alexander provided, however, matched a female person. At this point Officer O'Gwynn believed that Alexander was lying about his identity. Officer O'Gwynn shared his suspicion with Officer Haigh and asked him to see what identifying information Alexander would give to him. Officer O'Gwynn admitted he did not have any other reasonable suspicion that any of the four occupants had engaged in wrongdoing.

Officer Haigh again took identifying information from Alexander. The testimony does not reveal what information Alexander gave to Officer Haigh. In any event, Officer Haigh got into Officer O'Gwynn's patrol car to use the computer to check the

6

information Alexander provided.  Meanwhile, Officer O'Gwynn asked Alexander to step out of the car and asked if he had any guns, knives or drugs on him.  Alexander replied, "No."  Officer O'Gwynn asked if Alexander would mind if he patted him down.  Alexander said, "No."  Officer O'Gwynn instructed Alexander to turn toward the rear of the Lumina and put his hands on the trunk.  Officer O'Gwynn conducted a pat-down of Alexander and felt a handgun on the right side at the waistline.  Officer O'Gwynn reached into Alexander's waistband and pulled out a .357 Ruger six-shot revolver with his right hand.  He kept his left hand on Alexander and called out to Officer Haigh that he had found a firearm.  Officer Haigh told the car's other three occupants to show their hands, and he called for backup units.  Because Alexander had lied to him about his identity, Officer O'Gwynn was pretty sure that Alexander possessed the gun illegally because he did not present a permit to carry the handgun.  On closer examination of the gun later, Officer O'Gwynn realized the gun had an obliterated serial number.

Within seconds at least four patrol cars arrived on the scene. An officer handcuffed Alexander, but it is not clear from the testimony which officer completed the handcuffing.  Officer O'Gwynn arrested Alexander, gave him the <u>Miranda</u> rights verbally, and placed him in the back seat of his patrol car.  Officer O'Gwynn focused on handling Alexander, who continued to identify himself as Deran Albert.  Approximately twelve minutes had elapsed from the initial vehicle stop to the handcuffing of Alexander.

7

When the backup units arrived, all of the car's occupants were ordered to get out of the vehicle.  The women were placed in handcuffs and detained for officer safety, but they were not patted down.  They were read the <u>Miranda</u> rights.

Officer O'Gwynn admitted he did not have any reason to think that Odom had done anything wrong.  Officer Haigh opened the front passenger door, removed Odom from the vehicle, handcuffed him for officer safety, and conducted a pat-down search, but no weapons were found on Odom.  At some unknown point, the <u>Miranda</u> rights were read to Odom at the scene.  Officer Haigh searched the interior and trunk of the car incident to the arrest of Alexander.  He searched all parts of the car's interior, including the women's purses.  He saw nothing amiss in the vehicle.

The glovebox, however, was locked and Officer Haigh could not find the key to the glovebox on Ms. Johnson's key ring or in the vehicle.  Officer Haigh did not ask Ms. Johnson to produce the key to the glovebox.  Rather, because Odom had been sitting in the passenger seat near the glovebox, Officer Haigh reached into Odom's pants pocket and found the glovebox key.[2]  Officer Haigh then used the key to open the glovebox.  Officer Haigh felt it was better to open the glovebox with the key than damage the vehicle while opening the glovebox with tools.

---

[2]Officer Haigh also testified that he took the key from the pocket of Odom's "outer clothing."  The Court finds that Officer Haigh reached into Odom's pants pocket to retrieve the key because Officer Haigh also testified he thought Odom's coat was off and he could not recall if he put his hands in Odom's coat pockets.

8

In the glovebox Officer Haigh found a lightweight knit cap with a professional football team emblem on it lying on top of or around a loaded Taurus 9 millimeter semi-automatic handgun. (Def. Odom Ex. 1.) This weapon also had an obliterated serial number. Officer O'Gwynn recalled seeing Odom wearing the same hat earlier in the day when Odom attended the barbecue. O'Gwynn did not mention the hat in his report prepared the next day (Def. Odom Ex. 1.) At the scene, Ms. Johnson stated that the firearm found in the glovebox was hers. Odom denied that the firearm in the glovebox was his. Odom was taken to the police station for questioning because he sat in the seat nearest the glovebox and the key was in his pants pocket.

The entire traffic stop lasted fifteen minutes or less. All of the officers left the scene within one-half hour after Officer Gwynn stopped the Chevy Lumina. Officer O'Gwynn believes that he returned Ms. Johnson's driver's license, registration and proof of insurance to her shortly after he asked for it. He did not issue her a citation for violating the rear license plate illumination ordinance at that time because he was not ready to do so and he was conducting an investigation into the identity of the rear seat passengers.

All four occupants were taken to the police department for questioning. Alexander was correctly identified and officers learned there was an active warrant for his arrest for parole violation. The interview of Alexander was not recorded on audio or videotape. Officer O'Gwynn read the Miranda rights to Alexander

9

again at the start of the interview. Alexander signed a written form waiving his Miranda rights and consenting to be questioned. The Government did not introduce this waiver and consent form into evidence. Officer O'Gwynn has not seen the form since the file was turned over to the District Attorney's Office for prosecution. Alexander told Officer O'Gwynn he bought the firearm on the street for $75.00 and he wanted the weapon for protection because there had been shootings in his neighborhood. Officers also learned there was an active arrest warrant for Ms. Gaines for a probation violation.

Ms. Johnson was also given the Miranda rights at the police station. She waived her rights in writing and agreed to answer questions, but her waiver and consent form also was not introduced into evidence. The interview was recorded by hidden video camera. (Gov't Ex. 3.) Ms. Johnson told the officers that the gun found in the glovebox belonged to Odom, and she confessed that she had earlier told them the gun belonged to her because she was trying to protect Odom. She explained that she dropped Odom off at the barbecue earlier in the day and he possessed the gun at that time. She returned to the barbecue later in the day. In the afternoon, Odom asked for her car keys and he put the gun in the glovebox. Ms. Johnson was allowed to leave the police department. Ms. Johnson testified at the hearing that she felt free to leave the scene of the traffic stop before the police found the handgun in the glovebox, but not afterwards.

10

Although Officer O'Gwynn testified he gave Ms. Johnson a verbal warning at the police station to get the light over her rear license plate repaired, Ms. Johnson denied that she was given such a verbal warning. She did not know if the light worked or not. Ms. Johnson testified she had to ask Officer O'Gwynn twice why she was stopped and he did not ask her at the beginning of the vehicle stop whether there were any guns, knives, or drugs in the car. She further testified that Officer O'Gwynn did not return her driver's license, registration and proof of insurance to her until she was at the police station. Ms. Johnson did not know that Alexander had a gun on his person, but she knew there was a handgun in the glovebox of her car.

After Ms. Johnson's interview, Odom was interviewed. This interview was also recorded by hidden video camera. (Gov't Ex. 3.) Odom was placed in an interview room that appeared to be without a window. His left arm was handcuffed to the table and his right arm was free. He sat at the table by himself for approximately twenty (20) minutes. Odom had been handcuffed an additional thirty (30) to forty (40) minutes at the scene and during transport to the police station.

Detective Merrill Beene, Officer O'Gwynn and Officer Haigh then entered the room to conduct the interview. Detective Beene was dressed in plain clothes, but Officers O'Gwynn and Haigh were in uniform. Detective Beene knew Odom. Although the room was small, the four men could sit in the room comfortably. All three officers wore sidearms but the guns were not brandished or set out

11

in front of Odom during the interview. The uniformed officers sat on either side of Odom and Detective Beene sat in front of him. Detective Beene, who has extensive experience in the Murfreesboro Police Department's narcotics bureau, read the <u>Miranda</u> rights to Odom, and Odom then signed a written waiver of his <u>Miranda</u> rights and agreed to be interviewed. The Government did not introduce Odom's waiver and consent form into evidence.

During the twenty-minute interview, Detective Beene did most of the questioning. Odom was animated and argued back and forth with the officers, but the officers did not scream at Odom, threaten Odom, or try to force Odom to give particular statements. Detective Beene did not recall Odom requesting diabetic medication at any time, nor did Odom complain about the conditions under which the interview was taking place.

Detective Beene did ask the same or similar questions over and over again, and Odom gave different versions of events as these questions were asked. Odom insisted at the beginning of the interview that he did not possess the gun found in the glovebox and that the gun belonged to Ms. Johnson. Eventually he admitted that he had possessed the gun that morning, but not "today." At the end of the interview, Odom admitted the gun was his after he was told that Ms. Johnson disclosed during her interview that the gun was his and she had only tried to protect him. Odom then stated that he placed the gun in the glovebox. He said he purchased the gun for his own protection, but he knew he was a convicted felon. Odom was placed under arrest at the end of the interview, which lasted

12

twenty (20) to twenty-five (25) minutes. Detective Beene considered the interview to be short in comparison to others he had done.

In addition to other offenses, both Alexander and Odom were charged as felons in possession of firearms.

## II. <u>CONCLUSIONS OF LAW</u>

A temporary detention of individuals by police during a traffic stop, even if only for a brief period and for a limited purpose, constitutes a "seizure" of "persons" within the meaning of the Fourth Amendment. <u>Whren v. United States</u>, 517 U.S. 806, 810 (1996). An officer may stop a vehicle so long as he has probable cause to believe that a traffic violation has occurred, even if his true reason for the stop is motivated by something other than the traffic offense itself. <u>Id</u>.; <u>United States v. Ferguson</u>, 8 F.3d 385, 391 (6th Cir. 1993) (en banc). An officer also has authority to stop a vehicle for a brief investigative detention if the officer has a reasonable, articulable suspicion that criminal activity is afoot. <u>United States v. Simpson</u>, 520 F.3d 531, 540-541 (6th Cir. 2008). Defendants Alexander and Odom, who were passengers riding in Ms. Johnson's car, have standing to challenge their detention as a result of the traffic stop. <u>See</u> <u>United States v. Perez</u>, 440 F.3d 363, 369 (6th Cir. 2006).

At issue in this case is the interplay between state motor vehicle laws and an ordinance adopted in the municipal jurisdiction where the traffic stop occurred. Officer O'Gwynn testified he stopped Ms. Johnson as she drove down Hancock Street in the dark at

13

9:30 p.m. at night because her Chevy Lumina did not have an operating white light that illuminated the rear license plate so that it was clearly legible to a distance of fifty (50) feet. Defendants contend that Officer O'Gwynn lacked probable cause to stop Ms. Johnson's car because state law does not require illumination of the rear license plate on a passenger automobile. The Government counters that Officer O'Gwynn relied on an ordinance adopted by the City of Murfreesboro which requires illumination of the rear license plate. Defendants respond that the Court cannot consider the city ordinance because the Government failed to get it admitted into evidence at the suppression hearing, but even if the ordinance is considered, it is inconsistent with state law and could not provide a legal justification for Officer O'Gwynn's stop of Ms. Johnson's car.

The evidentiary issue is easily resolved. The Court marked a copy of the Murfreesboro ordinance, § 32-1005(c), as Government's Exhibit 1 for identification only because the Government did not lay adequate foundation for admission of the exhibit into evidence. In making this ruling, the Court relied on the Federal Rules of Evidence. The Court did not rest its decision on the Tennessee evidentiary rule cited by Defendants which precludes a court from taking judicial notice of an ordinance, but rather requires proof of the ordinance in the absence of a stipulation by the parties. See Metropolitan Gov't of Nashville and Davidson Co. v. Shacklett, 554 S.W.2d 601, 605 (Tenn. 1977); Valley Forge Civic League v. Ford, 713 S.W.2d 665, 669 (Tenn. Ct. Appeals 1986). Because the ordinance was not admitted into evidence, Defendants claim the

14

Court cannot take judicial notice of the ordinance and consider its substance. The Court may consider the substance of the ordinance even without taking judicial notice of it. As the Sixth Circuit recently made clear, the concept of judicial notice applies only to proof of facts. United States v. Dedman, 527 F.3d 577, 587 (6th Cir. 2008). The Court is still "entitled--and indeed required--to determine the applicable law[.]" See id. The Court carries the responsibility to determine what the law is on any given subject, and this is why the Sixth Circuit recently explained that "we used to allow judicial notice of state law, [but] now we consider that state law is simply a matter for the judge to determine." Id.

With this in mind, the Court examines the language of the pertinent portion of the Murfreesboro ordinance, even though the ordinance was not admitted into evidence at the suppression hearing. Section 32-1005(c) of the Murfreesboro Code provides:

> Either a tail lamp or separate lamps shall be so constructed and placed to illuminate with a white light the rear registration plate and render it clearly legible from fifty (50) feet to the rear. Any tail lamp or tail lamps, together with any separate lamp or lamps for illuminating the rear registration plate, shall be so wired as to be lighted whenever the head lamps or auxiliary driving lamps are lighted.

It appears that this ordinance was adopted in September 1989.

A Tennessee statute, Tenn. Code Ann. § 55-9-404(a), **Lamp at end of train of vehicles – Penalty.--**reads as follows:

> Every motor vehicle and every trailer or semitrailer which is being drawn at the end of a train of vehicles shall carry at the rear a lamp of a type which exhibits a yellow or red light plainly visible under normal atmospheric conditions from a distance of five hundred feet (500') to the rear of such vehicle, and such light shall be so constructed and placed that the number plate carried on the rear of such vehicle shall under like

15

conditions be so illuminated by a white light as to be
read from a distance of fifty feet (50') to the rear of
such vehicle.

A violation of this section is a Class C misdemeanor. Tenn. Code
Ann. § 55-9-404(c).

Section 55-9-404(a) was at issue in <u>State v. England</u>, 1998 WL
155584 (Tenn. Crim. App. March 31, 1998) (unpublished). In that
case, a Sumner County deputy sheriff stopped the defendant for a
violation of § 55-9-404(a) because defendant's pickup truck did not
have a light illuminating the rear license plate. The Sumner
County criminal court explicitly found that "[t]here is no question
that the defendant was lawfully stopped by the officer for a
violation of T.C.A. 55-9-404[,]" but granted the motion to suppress
on other grounds. <u>England</u>, 1998 WL at 155584 at *2. On the
State's appeal, the parties agreed that the officer made a lawful
stop under § 55-9-404(a), and argued other issues in the case.

In 1999, a district judge in this District suppressed evidence
in a case where a Metropolitan Nashville police officer stopped the
defendant for an alleged violation of § 55-9-404(a). <u>United States
v. McKissack</u>, 76 F.Supp.2d 836, 837 (M.D.Tenn. 1999). The district
judge ruled that § 55-9-404(a) did not apply to single vehicles,
but only to a vehicle located at the end of a train of vehicles.
<u>Id.</u> This interpretation derived from the title of the statute--
"**Lamp at end of train of vehicles–Penalty,**" and the court observed
that construing the statute to require a license plate light on
every automobile would make the statute much broader than the
statute's heading and would be contrary to the plain meaning of the
statute. <u>Id.</u> at 838-839. The court also noted that the content of

16

other statutory sections immediately preceding § 55-9-404(a), such as § 55-9-402 and § 55-9-403, applied to single motor vehicles and these statutes pertaining directly to single vehicles supported construing § 55-9-404(a) as not applying to single vehicles. Id. The court distinguished England on the ground that whether § 55-9-404 applied to a single vehicle, as opposed to a vehicle "at the end of a train of vehicles," was not at issue in England and the defendant admitted in that case that the officer made a lawful stop. Id. at 838. The court did not address the fact that the state trial court concluded as a matter of law after an evidentiary hearing that the initial stop was lawful and thereafter, the parties did not challenge the stop on direct appeal but instead focused on the other grounds given to justify suppression of evidence.

Six months after McKissack, the Tennessee Supreme Court issued its opinion in State v. England, 19 S.W.3d 762 (Tenn. 2000). With regard to the lawfulness of the initial stop in that case, the Tennessee Supreme Court stated:

> In this case, both parties agree with the lower courts' conclusion that the initial stop of England's pick-up truck was a legal stop, based upon his violation of § 55-9-404. Accordingly, the lower courts correctly concluded that the initial stop of England's vehicle was reasonable.

Id. at 766. Thus, because the parties no longer challenged the lawfulness of the stop after the trial court held the stop lawful under § 55-9-404(a), the Tennessee appellate courts did not discuss the issue in any greater detail.

17

Despite this apparent recognition by Tennessee state courts that a police officer could lawfully stop a driver if his vehicle did not have a white light illuminating the license plate, in 2004 the Tennessee General Assembly amended § 55-9-404 to add a new subsection (b) and renumber the old subsection (b) as subsection (c). Subsection (b) now reads: "The provisions of this section shall not apply to a single motor vehicle as is required in § 55-9-402, but shall only apply to the last motor vehicle being drawn at the end of a train or group of motor vehicles." The preamble of the legislative act did not mention the Tennessee Supreme Court's published opinion in <u>England</u>, but cited the federal court decision in <u>McKissack</u>. The preamble explained that the statute should be amended "to bring the statutes of this state into conformity with the common law on those occasions when the judiciary has interpreted the plain meaning of a statute[.]" 2004 Tennessee Laws Pub. Ch. 488 (H.B. 2846).

The Murfreesboro ordinance requiring a white light illuminating a vehicle's rear license plate, which has been in existence since at least 1989, is consistent with § 55-9-404(a) as that statute was construed by the state courts through 2000. <u>See England</u>, 19 S.W.3d at 766. It appears that, when the state legislature amended § 55-9-404(a) in 2004, the City of Murfreesboro did not thereafter amend its ordinance.

Because § 55-9-404(a) in its current form does not expressly apply to single vehicles and because Tenn. Code Ann. § 55-9-402 does not expressly require a single motor vehicle to be equipped with a white light illuminating the rear license plate, the

18

Defendants argue that the Murfreesboro ordinance requiring such a light is void because it is in conflict with state law. In support of this argument, Defendants cite Tenn. Code Ann. § 55-10-307(a), which currently provides in pertinent part:

> Any incorporated municipality may by ordinance adopt, by reference, any of the appropriate provisions of §§ 55-8-101 – 55-8-180, 55-10-101 – 55-10-310, 55-50-301, 55-50-302, 55-50-304, 55-50-305, 55-50-311, 55-10-312, and 55-12-139 and may by ordinance provide additional regulations for the operation of vehicles within the municipality, which shall not be in conflict with the provisions of the listed sections.

According to the Tennessee Supreme Court, "it seems beyond reasonable dispute that the legislature had a rational basis for enacting section 55-10-307." <u>City of Chattanooga v. Davis</u>, 54 S.W.3d 248, 276-277 (Tenn. 2001). "As we have previously recognized ourselves," the court explained,

> the legislature may confer jurisdiction upon municipal courts "to try and dispose of cases based upon violation of State [traffic] statutes" for the purposes of "economy, efficiency and expeditious handling of traffic cases." *See Hill v. State ex rel. Phillips*, 216 Tenn. 503, 508, 392 S.W.2d 950, 952 (1965). Indeed, as evidenced by the section immediately following 55-10-307, it was apparently for this very reason that the legislature permitted municipalities to adopt these traffic statutes by reference into their respective codes.[footnote omitted]

<u>Id.</u> at 276-277. Section 55-10-308 provides in pertinent part that "[w]here §§ 55-8-101 –- 55-8-180 and 55-10-101 –- 55-10-310 apply to territory within the limits of a municipality, the primary responsibility for enforcing such sections shall be on the municipality which shall be further authorized to enforce such additional ordinances for the regulation of the operation of vehicles as it deems proper[.]"

19

The language of § 55-10-307 unambiguously states that a municipality "may by ordinance provide additional regulations for the operation of vehicles within the municipality, <u>which shall not be in conflict with the provisions of the listed sections</u>." Section § 55-9-404(a) is not even listed in § 55-10-307(a) as one of the enumerated statutory sections which a municipality may adopt by reference and to which the prohibition against conflicting municipal ordinances applies. This lack of mention in § 55-9-404(a) in § 55-10-307 cuts against Defendants' argument that the Murfreesboro ordinance is in conflict with state law.

Additionally, at the time Officer O'Gwynn stopped Ms. Johnson's car on March 21, 2007, § 55-10-307 was not in effect. The statute was repealed effective June 27, 2006, Tenn. Code Ann. § 55-10-307 (2006), and the statute was not reinstated until May 10, 2007. Tenn. Code Ann. § 55-10-307 (2007). Thus, at the time the traffic stop occurred in March 2007, § 55-10-307(a) was not effective, and Defendants may not rely upon that statute to contend that Officer O'Gwynn enforced a municipal ordinance that is in conflict with state law when he stopped Ms. Johnson's car for failure to have license plate light.

Even if § 55-10-307 had been in effect and even assuming the Murfreesboro ordinance may have been judicially voidable as in conflict with § 55-9-404(a), the motion to suppress evidence still will not be granted. Officer O'Gwynn "had no objective reason to question the vitality" of the Murfreesboro ordinance. <u>United States v. Moreno</u>, 43 Fed.Appx. 760, 766-767 (6th Cir. 2002). As the Sixth Circuit stated in <u>Moreno</u> in construing a Memphis window-

tinting ordinance that was much broader in scope than Tennessee's
window-tinting statute,

> [f]acially, the ordinance was a commonplace automotive
> equipment safety regulation of the kind which fits neatly
> into the traditional "police power" of state and local
> governments to regulate the health, safety, welfare, and
> morals of the community. . . . A constable of the peace,
> unschooled in the jurisprudence of constitutional
> federalism and state law preemption is entitled to
> presume that a duly adopted city ordinance which he was
> sworn to enforce comports with the American Constitution
> and superior state law, absent facial invalidity or a
> contrary controlling judicial decree. . . .
>     Therefore, because Officer Valentine's invocation of
> the Memphis ordinance as authorization for the subject
> traffic stop was "objectively reasonable," that stop is
> unassailable *even if* the ordinance is judicially voidable
> by reason of conflict with the federal Constitution or
> the law of Tennessee. *See Illinois v. Krull*, 480 U.S.
> 340, 349-50, 107 S.Ct. 1160, 94 L.Ed.2d 364 (1987)
> (remarking, *inter alia*, that "[u]nless a statute is
> clearly unconstitutional, an officer cannot be expected
> to question the judgment of the legislature that passed
> the law.")

Moreno, 43 Fed.Appx. at 767 (emphasis in original).

The Court concludes that it was objectively reasonable for
Officer O'Gwynn, like the police officer in Moreno, to rely on the
validity of the Murfreesboro city ordinance that he was sworn to
uphold and enforce. See Krull, 480 U.S. at 342-344, 347 (holding
exclusionary rule does not require suppression of evidence where
there is no value in trying to deter police from acting in
objectively reasonable reliance on particular statutes later held
to be unconstitutional, for exclusionary rule was not intended to
deter legislators from passing unconstitutional laws). The
Murfreesboro license plate ordinance does not appear on its face to
be unconstitutional, even though it may now conflict with § 55-9-
404(a), and Officer O'Gwynn was entitled to rely on the judgment of

21

the city government that passed the ordinance.  See Moreno, 43
Fed.Appx. at 767.  Accord United States v. Smart, 393 F.3d 767, 770
(8th Cir. 2005) (observing Eighth Circuit follows rule that
distinction between police officer's mistake of law and mistake of
fact is not relevant to Fourth Amendment inquiry; validity of stop
depends on whether officer's actions were objectively reasonable in
the circumstances); cf. United States v. McDonald, 453 F.3d 958,
961-962 (7th Cir. 2006) (noting circuit split on whether police
officer's mistake of law can support probable cause and joining
courts holding that mistake of law cannot support probable cause).

Finally, the Murfreesboro ordinance remains consistent with
other provisions of state law.  At the time of the traffic stop,
Tenn. Code Ann. § 55-4-110(b) provided (emphasis added):

> **55-4-110.  Display of registration plates – Manner –
> Penalty for violation.–**
>
> * * * *
>
> (b)  **Every registration plate shall at all times be
> securely fastened** in a horizontal position to the vehicle
> for which it is issued so to prevent the plate from
> swinging and at a height of not less than twelve inches
> (12") from the ground, measuring from the bottom of such
> plate, **in a place and position to be clearly visible** and
> shall be maintained free from foreign materials **and in a
> condition to be clearly legible.**  No tinted materials may
> be placed over a license plate even if the information
> upon such license plate is not concealed.[3]

A violation of § 55-4-110(b) is a Class C misdemeanor.  Tenn. Code
Ann. § 55-4-110(c)(1).

---

[3]Tenn. Code Ann. § 55-4-103(f)(1) also stated in part that
"[t]o promote highway safety and increase visibility and legibility
on registration plates, the same shall be fully reflectorized."

22

Both state and federal courts in Tennessee have held that a police officer has probable cause to make a traffic stop in darkness if the license plate on a vehicle is not clearly visible or clearly legible to the officer. See State v. Matthews, 2002 WL 31014842 at **2-3 (Tenn. Crim. App. Sept. 20, 2002)(holding officer had probable cause to stop vehicle one-half hour after sunset where legislature intended vehicle license plates to be clearly visible at all times, defendant's rear license plate was not illuminated by white light to keep it clearly visible under § 55-4-110(b), and officer could not tell if car had a license plate); United States v. Dycus, 151 Fed.Appx. 457, 460-461(6th Cir. 2005)(holding officer had probable cause to stop vehicle in darkness where license plate was not illuminated, driver failed to keep license plate clearly visible as required by § 55-4-110(b), and officer could not tell if car had license plate). See also United States v. Anderson, 2008 WL 1734198 at **1-4 (E.D. Tenn. April 10, 2008)(holding officer had probable cause to stop vehicle for lack of clearly visible license plate under § 55-4-110(b) where license plate light was operating, but plate was not affixed in designated area and was instead propped up in back window where officer could not see the plate); United States v. Ratcliff, 2006 WL 2771014 at **4-5 (E.D. Tenn. Sept. 25, 2006) (holding officer had probable cause to stop vehicle for failure to keep license plate visible under § 55-4-110(b) where trailer hitch obscured one numeral of license plate); United States v. Walton, 2004 WL 3460842 at *4-5 (M.D. Tenn. Nov. 12, 2004) (holding officer had probable cause to stop vehicle where commercial frame around license plate blocked view of state of

23

registration and plate was not clearly visible under § 55-4-110(b)), *aff'd* 258 Fed.Appx. 753, 756 (6th Cir. 2007). <u>But</u> <u>see</u> <u>State v. Hall</u>, 2007 WL 2917728 at \*\*3-4 (Tenn. Crim. App. Oct. 5, 2007) (upholding suppression of evidence where officer stopped vehicle on basis that it was hard to see license plate, not that he was unable to see license plate); <u>State v. Anderson</u>, 2005 WL 292430 at \*\*1-4 (Tenn. Crim. App. Feb. 8, 2005) (upholding suppression of evidence where officer stopped vehicle because commercial frame partially obscured issuing county but courts determined that license plate was not obscured).

In this case, Officer O'Gwynn testified that he observed Ms. Johnson's Chevy Lumina driving down the street in darkness without a white light illuminating the rear license plate so that the plate was clearly visible and clearly legible. At a minimum, Officer O'Gwynn had reasonable suspicion to stop the vehicle to investigate an ongoing misdemeanor violation of state traffic law. Tenn. Code Ann. § 55-4-110(b); <u>Simpson</u>, 520 F.3d at 541 ("Since failure to keep a licence plate 'clearly legible' is an ongoing violation of § 55-4-110(b), the standard of reasonable suspicion applies."). As previously explained, in the Court's view Officer O'Gwynn also had probable cause to stop Ms. Johnson's vehicle for violating the Murfreesboro ordinance requiring a white light illuminating the rear license plate so that the plate was clearly visible and legible. Consequently, in light of the foregoing, the Court holds that the traffic stop in this case was lawful.

As Officer O'Gwynn pulled up behind the Chevy Lumina, his headlights illuminated the Lumina's rear license plate so that

24

Officer O'Gwynn was able to contact the dispatcher and identify the car he had stopped by the license plate number. Officer O'Gwynn did not run a check on the license plate number at that time.

Officer O'Gwynn approached the driver's door and Ms. Johnson promptly produced her driver's license, registration and proof of insurance upon request. In the ordinary course of police work, Officer O'Gwynn's had authority to ask the passengers to produce identifying information without implicating the Fourth Amendment. Hiibel v. Sixth Judicial Dist. Court of Nevada, 542 U.S. 177, 185 (2004). Defendant Alexander provided a false name and Social Security number to Officer O'Gwynn, and upon learning in a matter of less than five minutes that the information Defendant Alexander had given was false, it was not unreasonable for Officer O'Gwynn to ask Officer Haigh to question Defendant Alexander again about his identifying information. With the officers' reasonable suspicions aroused, Officer O'Gwynn lawfully asked Defendant Alexander to step out of the car. See Maryland v. Wilson, 519 U.S. 408, 410 (1997) (holding police may ask passenger to exit car). Officer O'Gwynn asked Defendant Alexander for consent to conduct a pat-down search for weapons, and Defendant Alexander granted such consent. Officer O'Gwynn then found the firearm in Alexander's waistband.

At that point, Officer Haigh called for backup, and when backup officers arrived, Ms. Johnson, Ms. Gaines and Defendant Odom were asked to get out of the Chevy Lumina. See Pennsylvania v. Mimms, 434 U.S. 106, 111 (1977) (holding police may ask driver to exit car); Wilson, 519 U.S. at 410. Having found a loaded handgun on Defendant Alexander, Officer Haigh was justified in conducting

a pat-down search of Defendant Odom to look for any additional weapons that might place the officers and others in danger.  See Terry v. Ohio, 392 U.S. 1, 27 (1968).

Officer Haigh's search of the vehicle for any additional weapons was proper as a search incident to Defendant Alexander's arrest.  See United States v. Nichols, 512 F.3d 789, 796-797 (6th Cir. 2008).  The search of the car's interior could permissibly extend to the locked glovebox. See id.

Finding the glovebox locked, Officer Haigh reached into Defendant Odom's pocket and pulled out the key to the glovebox. Using the key to open the glovebox, Officer Haigh located the handgun that Defendant Odom is now accused of possessing unlawfully.

Officer Haigh apparently felt the key in Defendant Odom's pocket earlier when he conducted the lawful pat-down search for weapons, although Officer Haigh did not testify directly on this point.  The Government has not defended Officer Haigh's conduct in reaching into Odom's pocket to retrieve the key, and the Court concludes that Officer Haigh's conduct was an unreasonable search forbidden by the Fourth Amendment.  See Minnesota v. Dickerson, 508 U.S. 366, 373 (1993) (holding Terry patdown must be strictly limited to that which is necessary to discover weapons that might be used to harm officers or others nearby); United States v. Holmes, 505 F.3d 1288, 1292 (D.C. Cir. 2007)(holding that officer had no right to take key from defendant's pocket during Terry patdown where key itself was not contraband).  Thus, the Court holds that the Government may not introduce the key into evidence

26

at trial or offer other evidence and testimony about Officer Haigh using the key to gain access to the locked glovebox. The Government also may not use evidence or engage in argument that the key taken from Defendant Odom's pocket is itself evidence of Odom's possession of the handgun and ammunition found in the glovebox.

The Government argued at the close of the evidentiary hearing that the handgun inevitably would have been discovered in the glovebox. The Government bears the burden to prove inevitable discovery by a preponderance of the evidence. <u>Holmes</u>, 505 F.3d at 1292. Officer Haigh testified that using the key to open the glovebox caused no damage to the car while using tools to open the glovebox would have damaged the car. Officer Haigh's testimony implies that he or other officers would have gained access to the locked glovebox by using tools even if the key had not been found. Defendant Odom did not produce any contradictory evidence. Thus, the Court concludes that the Government carried its burden to prove by a preponderance of the evidence that Officer Haigh or another officer would have used tools and force to open the glovebox and the handgun, ammunition and hat would have been inevitably discovered. For this reason, the handgun, ammunition and hat found in the glovebox will be admissible at trial.

The Court concludes that the traffic stop was not unreasonably prolonged because the stop in its entirety lasted fifteen minutes or less from the time Officer O'Gwynn turned on his blue lights to the point Defendants Alexander and Odom were placed under arrest following discovery of the loaded handguns. <u>See</u> <u>United States v. Ellis</u>, 497 F.3d 606, 612-614 (6th Cir. 2007). Considering all of

27

the circumstances, the Court concludes that the scope and length of the traffic stop did not transform the stop into an unconstitutional seizure.

Finally, Defendant Odom claims that he was subjected to unconstitutional interrogation at the police department. The Court does not agree. The interview lasted approximately twenty minutes and occurred between 10 p.m. and midnight. Odom was in police custody at the police station because he was under arrest and had one arm handcuffed to a table. However, having watched the videotape of Odom's interview, the Court believes that Odom is an adult male of at least average intelligence who has prior experience in the criminal justice system. Detective Beene read Odom the <u>Miranda</u> rights orally and Odom stated he understood his constitutional rights and waived them in writing, as captured in the videotape of the interrogation. This was the second time Odom had heard the <u>Miranda</u> rights read to him that night because the rights were also read to him at the scene of the traffic stop. Odom did not request an attorney or exercise his right to remain silent prior to the interview. Rather, he agreed to be interviewed.

The interview room was small, but four men sat around a table comfortably and none of the three officers were sitting on the same side of the table as Odom. Detective Beene did most of the questioning and repeated certain questions to probe Odom's veracity. The officers did not use physical force or threats in an effort to compel Defendant Odom to answer questions or give a confession. The officers were wearing sidearms, but they did not

28

show the weapons during the interview or set them on the table.  No promises were made to Odom in exchange for a confession.  Odom did not indicate he needed food, water, medical care or a bathroom break.  He did not at any time interrupt the questioning to request an attorney or invoke his right to be silent and end all further questioning.  In fact, Defendant Odom was very vocal during the interview and openly argued with Detective Beene.

The Court concludes that Odom willingly changed his story and admitted possession of the firearm found in the Lumina's glovebox after Detective Beene told Odom that Ms. Johnson had informed them the gun belonged to Odom.  At that point, Odom confessed that the gun was his and that he possessed it on the day in question.

Having considered the totality of the circumstances, the Court concludes that Defendant Odom's will was not overborne.  United States v. Craft, 495 F.3d 259, 263 (6th Cir. 2007).  Thus, the Court holds that any statements Odom made voluntarily or during police interrogation are admissible in evidence at trial. See Moran v. Burbine, 475 U.S. 412, 422-423 (1986).

### III.  CONCLUSION

For all of the reasons stated, Defendant Alexander's Motion to Suppress (Docket Entry No. 23) will be denied.  Defendant Odom's Motion to Suppress (Docket Entry No. 28) will be granted in part and denied in part.  The Government will be prohibited from introducing the Lumina glovebox key into evidence at trial, as well as any testimony by Officer Haigh or any other witness that the glovebox key was found in Defendant Odom's pocket at the scene of the traffic stop and that the key was used to open the glovebox.

29

The Government may elicit testimony from Ms. Johnson that she gave the glovebox key to Defendant Odom earlier on the day of the traffic stop and the Government may present evidence that the Lumina's glovebox was opened, where Officer Haigh found a handgun, ammunition and a hat. All other aspects of Defendant Odom's motion to suppress will be denied.

An appropriate Order will be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE